Randall Wayne **REDMAN,** By and Through his next friend and father, Ronald **REDMAN,** and James Stanley **Ewing** and Scott Tyler **Ewing,** by and through their next friend, Lewis Johnson as personal representative for the Estate of Judith Ewing, Plaintiffs,

v.

**UNITED STATES of America,**
**Defendant.**

**No. C88–1015–K.**

United States District Court,
D. Wyoming.

April 12, 1989.

John R. Hursh, Riverton, Wyo., Michael D. Zwickl, and Les Bowron, Casper, Wyo., for plaintiffs.

Wendy L. Rome, Trial Atty., Torts Branch, Civ. Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

ORDER GRANTING DEFENDANT UNITED STATES OF AMERICA'S MOTION TO DISMISS FOR WANT OF JURISDICTION (WITH FINDINGS)

KERR, District Judge.

The above-entitled matter having come on regularly for hearing before the Court on defendant's motion for dismissal or, in the alternative, for summary judgment; plaintiffs appearing by and through their attorneys, John R. Hursh, Michael D. Zwickl, and Les Bowron; defendant appearing by and through its attorneys, Wendy L. Rome, Civil Division, United States Department of Justice, and Richard A. Stacy, United States Attorney for the District of Wyoming; and the Court having heard the arguments of counsel and having fully and carefully reviewed and considered the motion and brief filed therewith and all matters pertinent thereto, and being fully advised in the premises, FINDS:

On September 2, 1985, a twin-engine Piper Seneca II aircraft, enroute from Minden, Nevada to Casper, Wyoming, spiraled downward after encountering severe weather conditions and crashed near Ogden, Utah, killing all on board—Dr. Charles W. Ewing (the pilot), his wife Judith, and Dr. and Mrs. John P. Kanaly. Surviving Ewing family members, along with the duly appointed personal representative of the estate of Judith Ewing bring this wrongful death action against the United States under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671–2680 (1982), seeking damages totaling $1,200,000 for alleged negligence on the part of the Federal Aviation Administration (FAA) in flight testing and removal of Dr. Ewing's visual flight rules (VFR) limitation and for failing to initiate an investigation or alternative enforcement proceeding upon claimed knowledge of an FAA flight inspector of Ewing's incompetence at multi-engine aircraft piloting under instrument conditions. The Court retains jurisdiction to decide the jurisdictional issue under 28 U.S.C. § 1346(b). *See Land v. Dollar,* 330 U.S. 731, 739, 67 S.Ct. 1009, 1013, 91 L.Ed. 1209 (1947).

With the threshold jurisdictional question still at issue [1], the United States' alternative basis for dismissal comes under Fed.R. Civ.P. 12(b)(6). The fact that materials outside the pleadings were submitted and considered does not serve to convert the motion to dismiss for lack of subject matter jurisdiction into a motion for summary judgment. Fed.R.Civ.P. 12(b). *See also Nichols v. United States,* 796 F.2d 361, 366 (10th Cir.1986) (Rule 12(b) does not autho-

---

**1.** The Government raised an additional jurisdictional defense premised upon 28 U.S.C. § 2401(b) and 14 C.F.R. § 15.3. These cited authorities are statutes of limitations and are inapplicable here since the administrative claim was filed August 28, 1987 and denied April 6, 1988, whereupon the instant suit was commenced June 23, 1988.

rize conversion whenever matters outside the pleadings are accepted).[2]

The following facts form the backdrop for this unfortunate tragedy. Dr. Ewing began training for single-engine certification on July 30, 1983 at a Casper air school where Thomas Rickert was the chief flight instructor. He received his certification on October 26, 1983. *See* Rickert Dep. at 7–9. At this time he owned, either individually or through his medical practice, a single-engine Cessna 182. In July 1984, Ewing, desirous of obtaining an instrument rating for the Cessna, took his first instrument flight test with Rickert. As Rickert described it, Ewing's performance was miserable: "[H]e failed the holding patterns … [H]e got totally lost and disoriented. He had no idea where he was and how to get back to where he was supposed to be." *Id.* at 18.[3] Rickert filed a "pink slip" notice of disapproval with the FAA in Oklahoma City, Oklahoma. *See id.* at 19–21. Ewing retrained in his areas of deficiency with Jim Gotsch, who had previously recommended Ewing for an instrument rating, and on August 1, 1984, Gotsch recommended him for a second instrument flight with Rickert. This time, following 1.1 hours in the air, he passed and received a rating for single-engine instrument flight conditions. *Id.* at 25.

The next day, August 2, 1984, Ewing had his first multi-engine flight with Rickert followed by another the day after.[4] *Id.* at 34, 35. These were not formal multi-engine flight checks since Ewing had not received the recommendation required before such checks may be undertaken. Apparently, as Rickert recounts, Gotsch had gotten upset with Ewing's attitude and would not recommend him for a multi-engine flight check. *Id.* at 12. Rickert refused to fly with Ewing unless he secured a recommendation. To that end, Rickert asked another instructor, Mike Kobos, to fly with Ewing. After 6/10 of an hour,

Kobos returned to Rickert and, in Ewing's presence, labeled Ewing a "basket case" he never wanted to fly with again. *Id.* at 13. This occurred around September 28, 1984, which incidentally was the last day that Gotsch gave Ewing dual instruction. *Id.* at 16. Ewing was visibly upset, retorting that he would find someone who would approve him. *Id.* at 14.

Meanwhile, policy changes regarding certification of pilots for instrument conditions in multi-engine aircraft were underway at the FAA. On August 27, 1984, a memorandum was sent from the FAA's Washington, D.C. headquarters to all regional offices, outlining a new policy which would become effective October 1, 1984. Under this new policy, all new applicants for a multi-engine rating would be required to demonstrate competency in piloting a multi-engine aircraft solely by reference to instruments regardless of whether they held an instrument rating for a single-engine plane. Attachment 2 to Govt's Motion Exh. 6. A letter apprising pilot examiners was dispatched September 28, 1984. Attachment 4 to Govt's Motion Exh. 6. A few days later, on October 3, 1984, a letter expressly superseding the September letter was sent to all pilot examiners with the additional proviso that any applicant who applies for a multi-engine flight test prior to December 1, 1984 would be exempt from the new instrument requirements provided he had logbook substantiation that multi-engine training began prior to October 1, 1984. Attachment 6 to Govt's Motion Exh. 6. Thus, the FAA instituted a two-month grace period whereby pilots already holding an instrument rating for a single-engine aircraft could ask for and receive a multi-engine instrument rating without additional examination.

On September 29, 1984, Ewing contacted Paul Hinman, the accident prevention specialist charged with, among other things, maintaining the competency of pilots oper-

---

**2.** The converse is true if the pending motion is for dismissal under Fed.R.Civ.P. 12(b)(6).

**3.** Failing the instrument test is apparently a common occurrence for first-time applicants. *Id.* at 24.

**4.** Ewing purchased the twin-engine Piper involved in this crash in April 1984. Amended Complaint at ¶ 16.

ating within the State of Wyoming and complained that the Casper instructors were trying to "milk him" for all they could before giving him certification.[5] Rickert Dep. at 38, 45, 47. Hinman had met Ewing at a pilot safety meeting the summer Ewing purchased the Piper. Hinman Dep. at 19. At this time Ewing was told his options were to either return to Rickert or go see Les Larsen, a flight examiner in Lander, Wyoming. Rickert Dep. at 44.

After contacting Larsen, Ewing flew his Piper from Casper to Lander without a multi-engine rating. Id. at 50. See also Larsen Dep. at 18, 19. Ewing never logged this flight time in his logbook. Rickert Dep. at 106. Rickert stated he did not know where Ewing was going and never reported this violation to the FAA. Id. at 42. When he later determined Ewing's destination, Rickert telephoned Larsen, alerting him that Ewing was a "special case" that required "extremely difficult" testing, apparently to avoid Ewing's somewhat deceptive practices when it came to competency evaluations. Id. at 49, 54. Cf. Larsen Dep. at 26–29 (Ewing cheating on his instrument test with Larsen).

When Ewing arrived in Lander, Larsen informed him of the need to obtain a recommendation before Larsen would fly with him. Larsen Dep. at 20. He sent Ewing to Larry Hastings, a flight instructor in Lander. Id. Ewing did not fly well with Hastings, who told him he would need considerably more training before Hastings would sign a recommendation. Hastings Dep. at 11. As Larsen described it, Hastings came back "about tearing his hair out." Larsen Dep. at 21. Again Ewing was upset but hesitantly returned for more training and, following a two-hour flight with Hastings on October 1, 1984, Hastings signed the recommendation. Hastings Dep. at 12, 14. See also Rickert Dep. at 48. Before October 1, 1984, Ewing's logbook reflects 2.8 hours of instruction with Hastings. Hastings Dep. at 14.

5. Throughout the review of this record are accounts of Ewing's belief that various instructors, one way or another, were attempting to extract as much money out of him as possible under

As soon as Ewing secured the recommendation, Larsen took him for a multi-engine flight check which Ewing performed satisfactorily under VFR conditions. Larsen Dep. at 24. Larsen told him he would next have to demonstrate his instrument flight rules (IFR) abilities. Initially Ewing refused but, after some straightening out by Larsen, later acquiesced. See id. at 24–25. From the start the instrument ride was a fiasco. At first Ewing stated he had a hood; later he said he did not. Id. at 25, 26. Then Larsen, with over forty years experience as a commercial pilot and thirty years experience as a flight examiner, saw Ewing cheating and deceptively looking outside instead of relying on instruments. Id. at 27. The following excerpt from Larsen's sometimes colorful deposition testimony is telling:

A. He was looking outside. I could tell. I have been instructing too long to be fooled by some[one] ... like that. But anyway, we proceeded on to the airport over at Riverton. He kept looking outside trying to see the airport out there. And I told him, I said, 'That 15 miles is quite a ways to see that runway.' It was a little bit hazy. I said, 'You better start doing what you told me you were going to do.' Well, he proceeded to go ahead anyway.

Well, finally when the localizer needle started to come in, he was looking outside instead of looking at the instruments. So we went right on past the localizer. But he finally spotted the runway.

Q. While this is all going on, were you just doing straight and level twin-engine flight?

A. Yeah. He was looking outside trying to find—see the runway. We went right on past it. Well, he spotted the runway out there and finally turned around till he was headed in at an angle but he was pointed right—had the nose of the airplane pointed toward the runway.

the guise of terming him incompetent to receive a certain rating—all due, as he saw it, to his professional stature.

We went along that way for a little ways and I says, 'Who are you trying to kid?'

'Well, he says, 'I am headed for the runway.'

I said, 'Yeah, I know, but you're not on the localizer. What's that needle doing buried clear over to the left-hand side?' which indicates that's where the localizer is. Well, then he made a real sharp turn and he bisected it at about almost a 90–degree angle. So we went charging along that way for a ways coming down way below the glide slope. Pretty soon he run right across that.

Well, when he saw the needle go clear across, why, then he rolled it up into a—it was about a vertical bank. We were about 200 feet above the ground. At that point, I grabbed the—took it away from him, told him, I said, 'That's all. Let's go home.'

Well, he still wanted me to give him another chance. I said, 'No, you proved that you couldn't even be honest with yourself.' I said, 'You're only kidding yourself. You're not kidding anybody else.' I said, 'You couldn't be honest with me then. Why would you be if you tried it again?'

Larsen Dep. at 27–29. Thus Larsen issued Ewing a multi-engine certificate but placed a "VFR-only" limitation on it.

This was the last that Larsen saw of Ewing, forwarding Ewing's file to the Casper FAA office. *Id.* at 29–30. A short while later, though, Ewing telephoned Larsen, asking him to lift the restriction. Larsen refused. Hinman initialed and sent Ewing's file to the Oklahoma City FAA office. Hinman Dep. at 31, 36. At about the same time came the FAA's superseding letter dated October 3, 1984, instructing FAA personnel that pilots who had verification of multi-engine training commencing before October 1, 1984 and already possessed an instrument rating for a single-engine plane would not be required to retest on multi-engine instruments in order to obtain an IFR rating. Larsen did not have the benefit of this letter at the time he administered the instrument portion of Ewing's multi-engine test. Larsen Dep. at 31.

Approximately a month later, Ewing went to see Hinman about removing the restriction, having heard about the FAA's policy change. Hinman Dep. at 39–40. By this time, Hastings had given Ewing an additional seven hours of instruction, culminating with a four-hour flight on November 4, 1984. Hastings Dep. at 18, 19. Of those seven hours, 5.8 were solely instrument instruction. *Id.* at 20. Hastings explained Ewing's performance during the instrument training:

A. He was doing very poorly in the beginning, and I worked with him and he came up to minimal standards with the training.

Q. He was able to learn and benefit from the training.

A. Yes, he did learn and advance. He was very poor in the beginning and agreed totally with Les Larsen's instrument portion, and then that's why I gave him additional training, was to try to help him in those areas. And I did tell him that I was not an instrument instructor.

Q. Okay. But back to the question that I asked you about how he did, at one time when I talked to you in Cheyenne, I believe you told me he showed really remarkable improvement.

A. Well, he did. He did improve considerably.

Q. I want to read one of your prior statements to you. This is from the Garner interview that I told you about before on page 6 at line 19. You say, 'We flew for another two hours around Casper and he remarkably improved. I was just amazed. Once he had faced his life with a very highly emotional thing. It kind of got him off his ego trip and he settled down to listening to the instruction he was getting and did very well.'

A. Right.

Q. Is that right?

A. That's what happened, yes.

Q. Is that true?

A. Yes, that's true.

Q. But later in that same day, when you came back to Riverton, he had another little lapse of not doing very well; is that right?

A. Yes, that's right.

Q. Can you explain that for me?

A. Well, he was doing well and we asked him to do an ILS instrument approach to Riverton and to intercept the 15 DME arc, which he started the interception at the proper time, was doing fine and then he lost—he went into a descending spiral to the left and lost basically control of the airplane. I let him go as far as I could and asked him, 'What are you going to do now? Are you aware of what's going on?' He was not aware of the bad situation, the diving spiral. And I told him to take the hood off and he did and he looked up and, of course, he corrected the situation.

Q. He corrected it or you did? Which one?

A. Well—

Q. Or don't you recall specifically?

A. I don't remember whether it was a combination of he and I, but I believe I pulled the throttles back and he—

Q. In any event, he did get into trouble and more or less lost control of the airplane when he was—

A. Yes, he did.

Q. —making the instrument approach at Riverton.

A. Yes, he did.

Hastings Dep. at 20–22. Hastings attributed fatigue from intensive training as one possible reason for the instrument approach failure. *Id.* at 23. At any rate, he suggested to Ewing that he not fly under IFR conditions until he obtained more total flying experience—a suggestion which Ewing ignored. *Id.* at 26, 34. Hastings signed a recommendation because, as he put it, he thought there had been an error in Larsen's procedure and that Hinman needed it to give Ewing another multi-engine check ride, not knowing that by this

time the VFR-only restriction could have been lifted without the recommendation.[6] *Id.* at 47–48.

Ewing returned to Hinman and, although not required, asked for a courtesy flight. Hinman Dep. at 40. Hinman described the results of the November 5, 1984 courtesy flight which lasted approximately an hour in the following exchange:

Q. ... From your best recollection, what did you do during that courtesy ride?

A. Okay. On that day we—I did an engine failure on the takeoff, where he would abort, and I brought the engine back in. He continued the takeoff. Went up, did a couple of steep turns, and he did an engine failure in flight. And I had him enter the holding pattern and get an engine back for the holding pattern.

And then I gave him another engine failure for a single-engine ILS approach, which is the hardest manuever [sic], and I did it all the way down to minimums where I took the hood off, where he called at minimums. And then watched him do a planned landing, which can be difficult for some people because of re-trimming of the airplane.

And he did a very good job on that flight, and I had no reason to determine under safety flight rules to continue his 'VFR only' rating. He was qualified, as I determined from those samplings of maneuvers.

Q. Did you do a critical engine out on the Seneca?

A. Yes.

Q. That was the one he used on the IFR approach?

A. That's correct. I did it prior to the approach, because our guidelines require us to do it prior to intercepting the final approach fix inbound.

Q. That's on an instrument check ride?

A. That's correct, with the hood on.

---

**6.** A perplexing but insignificant problem appears with this recommendation. While Hastings indeed did sign it, he testified that he left the instrument box blank since he was not an instrument instructor. *See* Hastings Dep. at 9, 45–46. Yet somehow, when Ewing brought the recommendation to Hinman, the instrument box was checked off. *Id.* at 46.

Hinman Dep. at 47–49. Hinman admits he did not give Ewing a full formal instrument check ride, *see id.* at 43, but, when asked why he chose the maneuvers he did, replied: "Because those are normally difficult for a new multi-engine pilot, and that would indicate to me that he is qualified if he can conduct those within tolerances required for that rating." *Id.* at 87. Following Ewing's satisfactory performance, Hinman removed the restriction Larsen had imposed, stressing that it was removed not due to Ewing's performance during the courtesy flight but rather because of the grace period outlined in the FAA's October 3, 1984 letter. *Id.* at 43. Nearly a year later, with the benefit of over 300 hours of flying time, Ewing chose to fly into a thunderstorm, sending himself and his three passengers to their deaths.[7] *See* Ewing Logbook, Govt's Motion Exh. 5.

Plaintiffs now seek compensation for this tragedy under alternative negligence theories. First, they contend that the FAA had actual knowledge of Ewing's incompetence under IFR conditions and, in fact, that Hinman was physically present during an instrument check ride administered to Ewing by Rickert where Ewing failed and yet neither Hinman nor other FAA personnel undertook any further inquiry; rather, Hinman, in his capacity as a flight inspector, following a "negligently conducted ... instrument flight test in violation of FAA procedural requirements ...," removed the VFR-only restriction. Amended Complaint at ¶ 30. In short, as plaintiffs see it, the very tragedy which occurred was, based upon Ewing's past performance, foreseeable and proximately caused by Hinman's negligent removal of the limitation imposed by Larsen. Finally, plaintiffs argue that Hinman had a separate affirmative duty, as accident prevention specialist, to pursue further inquiry and initiate retesting or other enforcement proceedings upon what they claim was actual knowledge of an incompetent pilot within his jurisdiction. Hinman's negligence in failing to do this, the argument goes, led to Ewing's disori-

entation in the thunderstorm, proximately causing the fatal crash.

The United States denies any actionable negligence on the part of any of its agents, employees, or representatives, contending that any claims plaintiffs may have more appropriately lie against others over whom it exercises no control. Consistently throughout this litigation, the Government's position has been that Ewing, through his own negligence, gross negligence, and willful, wanton, and reckless conduct brought about his own death as well as the deaths of three innocent individuals. This position's logical extension would be that the proximate cause of the accident was Ewing's failure to operate his aircraft as per the extensive instruction he received. The United States relies upon the discretionary function exception as embracing Hinman's actions as well as those of the FAA.

The FTCA allows for recovery of money damages against the United States

> for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b). In these instances the United States has waived its otherwise broad sovereign immunity and consented to being sued. Accordingly, the provision is to be strictly construed.

One exception to the relief afforded by § 1346(b), and the exception which the United States draws upon, bars suit against the United States for "[a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion

---

7. In their amended complaint plaintiffs acknowledge as much, stating that "flight into severe, adverse, instrument conditions" was a significant factor in the accident. Amended Complaint at ¶ 12.

involved be abused." 28 U.S.C. § 2680(a). This exception is commonly termed the discretionary function doctrine and in the instances—and they are vast—in which it applies, suit against the Government is barred even if the Government acts in a negligent manner. Whether this action is excluded by this or any other exception found in § 2680 is a matter of federal law. *United States v. Neustadt*, 366 U.S. 696, 705–706, 81 S.Ct. 1294, 1299–1300, 6 L.Ed. 2d 614 (1961). If plaintiffs' claims fall within the discretionary function exception, this Court has no jurisdiction and the suit cannot be maintained.

The legislative history of § 2680(a) was thoroughly analyzed in *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), *reh'g denied*, 346 U.S. 841, 74 S.Ct. 13, 98 L.Ed. 362 (1953), and *reh'g denied*, 346 U.S. 880, 74 S.Ct. 117, 98 L.Ed. 386 (1953), and *reh'g denied*, 347 U.S. 924, 74 S.Ct. 511, 98 L.Ed. 1078 (1954). Suffice it to say that the sort of discretion Congress intended to except is that of "the executive or the administrator to act according to one's judgment of the best course...." *Dalehite*, 346 U.S. at 34, 73 S.Ct. at 967 (footnote omitted). In the words of the Court:

> [W]hile Congress desired to waive the Government's immunity from actions for injuries to person or property occasioned by the tortious conduct of its agents acting within their scope of business, it was not contemplated that the Government should be subject to liability arising from acts of a governmental nature or function.

*Id.* at 27–28, 73 S.Ct. at 964 (footnotes omitted). Where there is room for choice, there is discretion. All employees exercising this discretion, including subordinates carrying out discretionary actions of superiors, are insulated. *See id.* at 33, 36, 73 S.Ct. at 966, 968. Through the creation of an exception for discretionary functions, Congress wanted to prevent "judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic,

and political policy...." *United States v. Varig Airlines*, 467 U.S. 797, 814, 104 S.Ct. 2755, 2765, 81 L.Ed.2d 660 (1984), *reh'g denied*, 468 U.S. 1226, 105 S.Ct. 26, 82 L.Ed.2d 919 (1984).

Although the contours of the discretionary function doctrine are troublesome insofar as they escape precise definition, some guidance has emerged from *Dalehite* and its progeny. First, courts must look to the nature of the conduct as opposed to the status of the actor. *Varig Airlines*, 467 U.S. at 813, 104 S.Ct. at 2764. If it involves the "permissible exercise of policy judgment," the discretionary function exception shields the conduct. *Berkovitz by Berkovitz v. United States*, —— U.S. ——, 108 S.Ct. 1954, 1960, 100 L.Ed.2d 531 (1988). Second, the acts themselves must be examined to determine whether they are the sort of actions which Congress intended to include within the exception. *Varig Airlines*, 467 U.S. at 813–814, 104 S.Ct. at 2764–2765. That the acts are those of regulatory agencies is not determinative; only discretionary acts are outside the FTCA. *Berkovitz*, 108 S.Ct. at 1960.

Congress has conferred authority upon the Administrator of the FAA to promulgate rules and regulations to "promote safety of flight of civil aircraft in air commerce...." 49 U.S.C.App. § 1421(a). *See also* § 1422. In furtherance of flight safety, the Administrator has promulgated regulations governing pilot certification and general operating rules. *See* 14 C.F.R. §§ 61–67, 91–109 (1988).[8]

Before a person can pilot an aircraft, he must possess a current pilot certificate. 14 C.F.R. § 61.3(a). Among the pilot certificates issued by the FAA is one for private pilots. § 61.5(a)(1)(ii). Contained on these certificates are various ratings. For example, a pilot might only be certified to fly a single-engine plane, in which case his certificate would reflect either a "single-engine land" or a "single-engine sea" rating. §§ 61.5(b)(2)(i) and (iii). In addition, there are ratings which define the kind of conditions that he may fly in. *See* § 61.63. The

---

**8.** For the most part, these regulations and others cited throughout this opinion are similar to the regulations as they appeared in 1984 and 1985.

latter ratings will determine whether a pilot flies under VFR or IFR conditions. *See, e.g.,* 14 C.F.R. §§ 61.5(b)(6)(i), 91.105–91.109, 91.115–91.129. Which ratings are placed on a pilot certificate depends upon whether the pilot successfully completes testing in the various areas.[9]

Congress allows the Administrator to delegate the task of performing the examinations, inspections, and testing needed for certification in the realm of civil aeronautic safety to private persons. 49 U.S.C.App. § 1355(a). Such delegation is seen here in the form of private flight instructors. Although not an employee of the FAA, anyone wishing to be a private flight instructor must show competency and be certified as an instructor. 14 C.F.R. §§ 61.181–61.201.

Prior to being eligible for certification, an applicant must complete a number of prerequisites, including any required written tests, instruction, and a flight test. §§ 61.35 and 61.39. To receive a flight test, an applicant must secure a written recommendation of his readiness from a certified flight instructor. § 61.39(a)(5). A recommendation represents to the flight examiner that the applicant has satisfactorily completed flight instruction with the certifying instructor. Only after the flight examiner receives the recommendation can he administer a flight test. An applicant's entitlement to a certificate then turns upon how he applies his aeronautical knowledge in the context of executing the requested maneuvers and emergency procedures and whether he shows an ability to exercise good judgment. § 61.43(a). During the course of the flight test, an applicant must demonstrate proficiency in preflight operations, airport operations and collision avoidance procedures, recognition of and recovery from imminent and full stalls from straight flight and from turns, normal and crosswind takeoffs and landings, night flying, and other areas. § 61.107(a). *See also* 14 C.F.R. Part 61, App.A. Depending upon the outcome, the applicant receives the appropriate certificate and ratings. If he fails in any of these areas, ratings for the failed areas will be withheld until he improves, receives another recommendation, and satisfactorily retests. § 61.43(b). All instruction time an applicant receives must be logged in a logbook and certified by the respective instructor. § 61.51(c)(5). Finally, the FAA is empowered to amend, modify, suspend, or revoke any certificate or rating if the Administrator concludes that air safety is being compromised. 49 U.S.C.App. § 1429.[10]

■ Plaintiffs' initial claim revolves around the removal of Ewing's VFR-only restriction, the contention being that Hinman negligently performed the courtesy check ride and then improperly removed the limitation. They rely heavily on the *Berkovitz* decision, claiming a close factual alliance. In so doing, plaintiffs urge that *Berkovitz* is distinguishable in its holding from what they perceive as the seemingly all-encompassing language of *Varig Airlines.* Because this Court views the *Berkovitz* decision not as a retreat from *Varig Airlines* by any perceptible degree, as plaintiffs would seem to suggest, and finds that the decision to remove the limitation represented the carrying out of a policy decision of the most basic kind, the conclusion that removal of the restriction was discretionary is inescapable.

*Varig Airlines* addressed the tort liability of the Government for two aviation incidents where people died following in-flight fires. In one case, a fire started in one of the lavatories of a Boeing 707, inundating the cabin and cockpit with a thick black smoke which caused the deaths of 124 of the 135 people on board. In the other case, a heating unit in a private plane malfunctioned and caught fire, ultimately causing the plane to crash, killing the pilot, copilot, and two passengers. The basis for the suits against the FAA was negligence in certifying the planes as airworthy without inspecting them. After setting forth the pertinent statutory and regulatory lan-

---

**9.** Temporary certificates or ratings may be issued during the review of an applicant's qualifications and until a permanent one is issued. § 61.17.

**10.** Section 609 of the Federal Aviation Act of 1958.

guage governing the various aspects of aircraft certification, the Supreme Court concluded that the actions of the FAA fell within the discretionary function exception due to the FAA's authority, acting under the direction of the Secretary of Transportation pursuant to congressional mandate, to delegate the work of planning, inspecting, testing, and other compliance procedures to aircraft manufacturers themselves. The FAA would then review data and in random instances conduct "spot checks" for compliance. The "spot check" operation was detailed in FAA manuals and was undisputably a policy decision which took into account the realities posed by the limited number of FAA engineers. Thus the Court held that where "[d]ecisions as to the manner of enforcing regulations directly affect the feasibility and practicality of the Government's regulatory program ..." an agency's actions are shielded from liability by the discretionary function exception. *Varig Airlines,* 467 U.S. at 820, 104 S.Ct. at 2767. Any other rule would involve the federal courts in "second-guessing" social, economic, and political policy decisions of an agency in areas where it was clearly intended that the agency itself have the choice in formulating and implementing programs designed to carry out its regulatory role. *See id.*

Four years later, the Supreme Court revisited the discretionary function exception with *Berkovitz,* a regrettably heart-wrenching case where an infant ingested a dose of an oral polio vaccine and contracted a severe case of polio which ultimately rendered him completely paralyzed and unable to breathe without a respirator. Suit was filed against the United States, charging that the vaccine was wrongfully licensed and released. *Berkovitz,* 108 S.Ct. at 1957. Although the Court did not preclude governmental liability due principally to abstruse regulations and a scanty record which it felt required a reversal of the Third Circuit's decision dismissing the claims under the discretionary function doctrine and a remand to the district court

to decide whether the agencies involved appropriately exercised policy judgment in licensing and releasing the product, the Supreme Court did restate and clarify the reach of the discretionary function exception. *Id.* at 1959, 1963, and 1965. The Court reiterated the teachings of *Dalehite* and *Varig Airlines* and specifically stated that "the [discretionary function] exception was designed to cover not all acts of regulatory agencies and their employees, but only such acts as are 'discretionary' in nature." *Id.* at 1960 (footnote omitted).[11] The Court held that the exception may be properly invoked only when there is "conduct that involves the permissible exercise of policy judgment." *Id.*

Plaintiffs are correct when they speak of the mandatory nature of the pilot certification laws. The statutes and regulations require that *all* applicants must be tested and must perform within guidelines set by the FAA in order to be licensed to fly. It follows that "[i]f the applicant fails any of the *required* pilot operations ..., the applicant fails the flight test ... [and] is not eligible for the certificate or rating sought until he passes any pilot operations he has failed." 14 C.F.R. § 61.43(b) (emphasis added). In this sense, the factual resemblance to *Berkovitz* is undeniable and discretion is absent.

Where plaintiffs miss the mark, however, is with their characterization of the lifting of Ewing's restriction as non-discretionary. Had Hinman removed the restriction absent any FAA policy letters like the ones here and with knowledge of Ewing's prior instrument test results, plaintiffs would have a stronger case for damages. The same conclusion would follow if under the same circumstances Hinman had issued Ewing a pilot certificate without any testing whatsoever. In either instance, Hinman's actions would be nondiscretionary and plaintiffs would be in a position to bring suit.

That is not the case here. Examining the nature of the conduct involved in the

---

11. This language does not stray from that used in *Varig Airlines. See Varig Airlines,* 467 U.S. at 813–814, 104 S.Ct. at 2764–2765 (discretionary function doctrine encompasses *discretionary* acts of Government acting in a regulatory role).

instant case the Court is persuaded that Hinman's actions were the product of discretionary policymaking at the highest levels of the FAA. As reflected in an FAA teletype, the stated purpose of the grace period was "to ensure timely public notification of ... [the new] certification requirement." Attachment 5 to Govt's Motion Exh. 6. Plaintiffs' contention that Hinman's actions were violative of 14 C.F. R. § 61.43(b) is without merit; for, the institution of this grace period meant that during its duration, an instrument test like the one which Ewing took and failed was not a "required" pilot operation within the meaning of that regulation.

The decision to afford a reasonable period within which all concerned can adjust to changes in pilot certification requirements is part and parcel of those decisions which "directly affect the feasibility and practicality of the Government's regulatory program ... and require the agency to establish priorities for the accomplishment of its policy objectives by balancing the objectives sought to be obtained against such practical considerations as staffing and funding." *Varig Airlines*, 467 U.S. at 820, 104 S.Ct. at 2767. As the Government correctly points out, the FAA has a legitimate interest in avoiding challenges to new rules where it can be reasonably done. Furthermore, becoming a pilot is an expensive undertaking often requiring financial budgeting in advance based upon expectations about the amount of training and testing an applicant will need on the road to certification. Such a grace period takes into account those applicants already financially committed and strikes a reasonable balance between interests on both sides. This grace period being a clear discretionary action, Hinman's compliance as a subordinate facilitates the implementation and is likewise discretionary. *See Dalehite*, 346 U.S. at 35–36, 73 S.Ct. at 967–968. Accordingly, Hinman's act of removing the restriction from Ewing's twin-engine certificate and giving him an instrument rating is not actionable under the FTCA. *See also Weiss v. United States*, 787 F.2d 518, 523 (10th Cir.1986) (a duty is discretionary if it involves judgment, planning, or policy decisions).

■ This leaves plaintiffs' other negligence claim, namely the allegation that Hinman possessed actual knowledge of Ewing's incompetence under instrument conditions and as an accident prevention specialist charged with maintaining safety had an affirmative duty to initiate an investigation and retest Ewing.[12] Recognizing that plaintiffs are not required to prove their factual allegations on a motion to dismiss, the Court finds not even a scintilla of evidence supportive of their proposition that Hinman was or should have been aware of Ewing's less than adequate instrument ability. This is not a scanty record. Plaintiffs initially allege that Hinman personally observed Ewing's incompetence under IFR conditions when he was a spectator aboard an aircraft during a check ride conducted by Thomas Rickert. Amended Complaint at ¶ 26(a). When asked about this, Hinman acknowledges he was aboard a plane while Rickert was conducting a check ride where the pilot flunked but categorically denies that the pilot was Ewing. Hinman Dep. at 62–63. Rickert—*plaintiffs' own expert witness*— confirms this. Rickert Dep. at 30.

As another example, plaintiffs note that Hinman read and approved flight examiner Larsen's report wherein mention was made of the VFR-only limitation. Amended Complaint at ¶ 26(b). Thus, the argument goes,

---

**12.** Plaintiffs couch Hinman's duty in mandatory terms; however, a review of § 609 of the Federal Aviation Act of 1958, 49 U.S.C. § 1429 reveals permissive language:

The Administrator *may*, from time to time ... reexamine any civil airman. If, as a result of any such ... reexamination, or if, as a result of any other investigation made by the Administrator, he determines that safety in air commerce or air transportation and the public interest requires, the Administrator *may* issue an order amending, modifying, suspending, or revoking, in whole or in part, any type ... airman certificate....

49 U.S.C. § 1429(a) (emphasis added). *Cf. Wendler v. United States*, 782 F.2d 853, 855 (10th Cir.1985) (FAA decision to initially suspend pilot's certificate and later reissue a certificate subject to conditions is a discretionary power designed to promote air safety).

Hinman had actual knowledge of Ewing's disappointing performance under instrument conditions. According to Larsen, the only notice to anyone of Ewing's dismal performance by instruments would be on the certificate itself through the designation "VFR-only." [13] Larsen Dep. at 74. As Larsen later concedes, a VFR-only limitation is arguably susceptible of two different meanings—either the applicant flunked the instrument test or never chose to take it. See id. at 75–76. Hinman interpreted the "VFR-only" language as meaning that Ewing had not been tested for instruments. Hinman Dep. at 39. See also id. at 43–44. Such an interpretation is entirely reasonable given the absence of any statements, written or oral, specifically informing Hinman of Ewing's failure under IFR conditions.

Next plantiffs insist that on more than one occasion Rickert told Hinman of Ewing's incompetence. Amended Complaint at ¶ 26(c). Closely intertwined with this allegation is their claim that *after* Rickert learned the restriction had been lifted, he expressed to Hinman an opinion that "it was a terrible mistake" and that "Dr. Ewing will be dead within one year." Id. at ¶ 26(d). As regards the latter statements, Rickert does not deny making them but insists they were made immediately after Larsen imposed the restriction and, therefore, *before* Hinman removed it. Rickert Dep. at 67–68. Regardless when such statements were made, opinions such as these hardly translate into the "hard facts" Hinman said he would need in order to warrant action. See Hinman Dep. at 86. ("You have to have hard facts; i.e., an accident an individual was involved in, an accident that could be caused by lack of competence of the individual.") As for other statements, either to an FAA office or to Hinman, the only instructors and examiners in a position to know, namely Rickert, Hastings, and Larsen—all plaintiffs' expert

witnesses—state that neither they nor anyone else to their knowledge reported any violations.[14] See, e.g., Rickert Dep. at 68, 70, 91; Hastings Dep. at 35, 36, 40–41; and Larsen Dep. at 59. Hinman acknowledges that he was aware of an accusation against Ewing regarding flight into adverse weather conditions but this occurred prior to Ewing's receipt of a single-engine instrument rating. See Hinman Dep. at 69–70.

Plaintiffs assert that "Hinman removed the 'VFR-only' limitation with no check ride or instructor sign off whatsoever." Plaintiffs' Memorandum In Opposition to Defendant's Motion, p. 28. Hinman freely admits he never administered a full instrument check ride, Hinman Dep. at 43; however, at Ewing's request, he gave Ewing a courtesy ride on instruments which Ewing completed satisfactorily. These maneuvers represented a sampling which Rickert stated would be sufficient to ascertain instrument competency. Rickert Dep. at 116.

The bottom line is that the FAA is a promoter—not an insurer—of safety. A pilot has to take some responsibility for his own actions. The picture plaintiff's experts paint of Ewing is not a very complimentary one at all. In Ewing's case, all concerned agree that it was Ewing's own overconfidence and poor judgment that doomed his flight. See, e.g., Rickert Dep. at 84; Hastings Dep. at 33, 44; and Larsen Dep. at 77, 89. *All with first-hand knowledge* of Ewing agree that this tragedy was not the fault of the FAA. See, e.g., Rickert Dep. at 83; Hastings Dep. at 33–34; and Larsen Dep. at 55, 68.

An integral part of all the training and testing *all pilots* receive is common sense instruction on avoiding flight during severe weather activity, especially thunderstorms and icing conditions. Ewing was no exception. See, e.g., Rickert Dep. at 9–10, 27–28; Hastings Dep. at 33; and Larsen Dep. at

---

**13.** Of note, Ewing's logbook entry for the testing session with Larsen reflects the notation "satisfactorily passed multiengine," followed by Larsen's signature. Id. at 72–73.

**14.** There is some discussion in the record of the nickname "Kamikaze Bill" which was given to

Ewing; however, in spite of knowledge of the nickname by some in the aviation community, Rickert indicates he never related this nickname to Hinman and does not recall that the nickname was ever used in front of any FAA official. See Rickert Dep. at 104–105, 109–110.

52–53. *See also* FAA Flight Test Guide (Part 61 Revised 1975); Aviation Weather; FAA Airman's Information Manual, Basic Flight Information and ATC Procedures (September 2, 1982); FAA General Aviation, "Thunderstorms—Don't Flirt ... Skirt 'Em"; FAA Advisory Circular, AC No. 00–24A (June 23, 1978)—all found as Attachments 7–11 to Govt's Motion Exh. 6.

The FAA Flight Test Guide and Advisory Circular and other manuals contain an overwhelming amount of information on thunderstorms. *See* Attachments 7 through 11 to Govt's Motion Exh. 6.[15] The forces at work within a thunderstorm system, including extreme wind currents and frequent hail and shear activity, combine to create hazardous turbulence which not only can damage an aircraft but destroy it as well. *See* Hastings Dep. at 35. No license the FAA issues authorizes flight into severe weather conditions. *See, e.g.,* Rickert Dep. at 28; Hastings Dep. at 34; and Larsen Dep. at 56.

In spite of all this exposure and in spite of warnings from an air traffic controller at the Ogden tower of dangerous thunderstorms along with hail, wind shears, lightning, and icing conditions above 11,000 feet in Ewing's flight path that fateful day as well as reports of severe turbulence from other pilots in the area, Ewing's response: "I'll go at thirteen thousand...." Transcript of Tower Transmissions, Govt's Motion Exh. 13. With those words, Ewing condemned himself and his passengers to the equivalent of suicide.

While the Court is not insensitive to the grief this ill-fated trip has visited upon the surviving family members of those who perished, it cannot allow an action to go forward where none could be brought under the law. Blame for this tragedy lies not with the United States. Every precaution that was required, short of the impractical one of assigning an FAA official to Ewing round the clock, was taken. It is an undeniable fact of life that a certificate to fly, or a license to drive an automobile for that matter, is not a recognition—much less a guarantee—that the recipient will at all times draw upon good judgment in operating the particular mode of transportation. In fact, all a certificate or rating signifies is a pilot's competence on the day of the test. It says nothing about the pilot's ability down the road. Rickert Dep. at 28–29. A pilot's inclination towards recklessness and flawed judgment which, as in the instant case, results in tragedy cannot through the marvelous tool of hindsight translate into a basis for liability on the part of the Government for issuing the certificate or rating absent an affirmative showing of a claim which is cognizable under the FTCA.

Since no such showing has been made out here, this Court is not prepared to embark upon the road plaintiffs would urge. When Congress created the FTCA, its purpose was not to provide federal funding for mishaps occasioned solely by a pilot's inclination toward poor judgment in the operation of his plane. Were this Court to chart the course proposed by plaintiffs, it would, in effect, be legislating an entirely new area of law the ramifications of which would most assuredly hopelessly inundate the federal courts with claims as boundless as the mind can imagine, ultimately crippling the Government's ability to carry on its day-to-day operations. As legislating is not the business of the courts and for the reasons more fully developed above, recovery under the facts of this case is not allowable. Today's decision is in keeping with the intent of Congress by preventing precisely the sort of judicial "second-guessing" envisioned in *Varig Airlines.*

NOW, THEREFORE, IT IS ORDERED that defendant United States of America's motion to dismiss be, and the same is, hereby granted; it is

---

**15.** Significantly, an FAA accident brochure which Ewing had been exposed to ends its information on thunderstorms with the following warning:

Do not let compulsion take the place of good judgment—the first decision need not be your last if it's a one-hundred-eighty degree turn— *Safety is Always Professionalism.*

FAA General Aviation, "Thunderstorms—Don't Flirt ... Skirt 'Em," Attachment 10 to Govt's Motion Exh. 6, p. 3 (emphasis in original).

778

FURTHER ORDERED that the above-entitled action be, and hereby is, dismissed for want of jurisdiction.